Good morning, Your Honors. Kristin Liskow on behalf of the Attorney General, and I'd like to reserve about five minutes for rebuttal. I'll try to keep an eye on the clock. May it please the Court. The California Legislature unanimously enacted the California Age-Appropriate Design Code Act to protect children and their privacy online. The Legislature was motivated by documented harms to children from online companies' data and privacy practices, including addiction-like behaviors, lack of sleep, negative impact on educational attainment, exploitation, and detrimental mental health outcomes. Counselor, I think all of us would say the objective is one that we could only laud, but we are dealing with the First Amendment here, and we have some questions about the nature of what is included in this bill. I'm going to use an abbreviation, but I want to make certain the record is clear. I'm talking about the Data Protection Impact Assessment, which is at Civil Code 1798.99.33a. I'm going to call it the DPIA, okay? This law forces the private parties to opine what they think is a material detrimental to children. How isn't that compelled speech? So, if we're talking about just the DPIA report itself, I don't think that we would dispute that the requirement to prepare a report can be considered compelled speech. Okay, and if it is compelled speech, don't you run into a First Amendment problem? We would argue that it's constitutional as a disclosure, since it's a factual, non-controversial disclosure. Well, you talk about this is framed as data management practices, but isn't the first of the data management practices that are called on for these companies whether the content of what is provided online is potentially harmful? How is that not a content-based restriction rather than a pure factual disclosure? So, I think that what's critical is that the purpose of the DPIA requirement is to look at how the data practices pose risks of material detriment to children. And so, in the process Do the data practices include an evaluation of whether the company's online content is harmful to children? No, the data practices would not. Our understanding of the statute is that the DPIA requirement would look to how does the use of data potentially expose children to harmful content, not into an analysis of an exhaustive array of what content is harmful or not. And I can provide an example. For instance, a company might use data for targeted behavioral advertisements where they take the personal information they've collected to try to determine which advertisements a user is more likely to click on. So, perhaps they then would use advertisements that might advertise products that are illegal to sell to minors, tobacco or alcohol products. Another example might be a company may use data to determine what order to display Post-it. Those seem to be addressed by Romanets 6, 7, and 8, or perhaps 7 and 8, but there's also Romanets 1, which speaks to content, 2, which speaks to contact, 3, to whether it permits children to witness harmful conduct, which, again, seems to be content. What are examples of those that you think would not trigger content-based scrutiny under the First Amendment? So, again, I think that the focus of this analysis is not on the content itself. There's no requirement to look through and decide what type of content is harmful. The question is about the data use. So, an example may well be if you use prior search history, for instance. So, say a minor child does a research project on eating disorders for a health class, and then that data, that search data is put into an algorithm, and then videos that promote eating disorders are recommended to the minor. That's an example of how data practices might lead to minors using harmful content. But it seems to me that you require these companies to make a decision, to have an opinion about the nature of what's involved there. As you know, a lot of the amicus briefs and so on talked about things like that can disturb children generally, like climate change or wars or even internally local violence and so on and so on. But you're asking these companies to have an opinion about these things and express it. And it's not like a cigarette thing. There's so much tar in this and so on. It's not a commercial thing. You're asking them to make a determination, and that's what I'm troubled about. It seems to me that when you are asking them to make that, it's compelled speech, and you do bring in the First Amendment, and probably at a strict scrutiny level. What am I missing? So a couple of responses to that, Your Honor. I think, first, the DPA requirement certainly does not require companies to make an exhaustive list of what content is harmful. And perhaps it might be helpful to— Well, maybe not an exhaustive list, but they have to state, with respect to any particular app, how it would be harmful to children. They've got to consider these things, right? They need to consider the data use. We would not argue that they need to look and decide what content is harmful. And it may be helpful if we look at—there is a sample of the DPA in the record. And this is on—I don't have the volume number in front of me, but ER 551 has an example of a DPA that does this analysis. This is from the U.K., but the law is clear. But, Counsel, going to Judge Smith's question, I'm looking, for example, at two little eyes. Whether the design of the online product, service, or feature could lead to children experiencing or being targeted by harmful or potentially harmful contacts on the online product, service, or feature. And when I read that as an example, it strikes me as doing exactly what Judge Smith described it as doing, as opposed to some high-level data analysis. So, just, again, I think our view of how the statute operates is that there's no requirement—I think everyone here would agree that there is harmful content that exists in the world for children, and there are harmful contacts for children, people who seek to exploit them. I don't think anyone disputes that fact. There may be dispute about what falls within there, but we all— Are you saying—are you confessing, if you will, that the state is trying to regulate the content? No, Your Honor. We're concerned about the data collection practices. So, if we— But, seriously, I mean, come on. If data is just a report of numbers and what it says, you're requiring them to make a determination whether what they have there is harmful to children. It's not just numbers. They have to decide whether it is, and on some basis. To me—I'm looking for you to correct me if I'm wrong—to me, that's a requirement to moderate or admit content. And if you get there, then you've got a First Amendment challenge, right? Again, we disagree that that's how the statute operates, Your Honor. If you look at the language, it says, to identify the purpose of the service, how it uses children's information, and the risks of material detriment to children that arise from the data management practices. But who does—so—but they only need to do that with respect to harmful content. Who decides what's harmful? So, again, if we look at it this way—and, again, I think maybe looking at the example with the record of what a DPA looks like— Well, an example from a jurisdiction that does not have a First Amendment is probably less helpful for us. No, but I think the point that I'm attempting to make, Your Honor, is that in the world in which we all agree there's harmful content out there, one can analyze the extent to which such content could be exposed to minors by data practices without having to get into what is that whole universe of content. I don't think anyone disputes harmful content out there. And so the question isn't, what is that universe of harmful content we're concerned about? What is that world of things we don't want—we're worried about might hurt children? It's, how does the way you use their data potentially expose them to that universe, which we know is not a null set? But what happens on the margin if there's a disagreement about whether the triggering content is harmful? So, for example, Judge Smith's examples and the examples in the briefs about images of war or climate change or things that, you know, do seem to have harmful effects on children but are also true and protected by the First Amendment. So the question is simply the extent to which this harmful conduct, harmful content, which, again, it's not a universe that we need to define, whether the data practices might expose children to it. But I do want to take a further step back and just note that there may be some of these difficult questions that we put with the margins, but this is a facial challenge that was brought by plaintiffs. They're abundantly clear from the—I think it's Paragraph 4 of their complaint that this is a facial challenge. And Moody is clear that when analyzing a facial challenge, the question is, do the unconstitutional applications substantially outweigh the constitutional? We're looking at— Well, it's true what Moody said in that regard. But if we're just limited to the DPIA, is it your argument that we cannot analyze that portion of this legislation on a facial basis? We would say that you can, Your Honor, but there's a whole swath of things in the DPIA that are not at all related to content. For instance, harmful contacts could refer to situations where, do they allow any adult to message a child online without first having parental permission or without allowing some prior connection? So, Counsel, you've certainly argued that the statute is severable. Yes, Your Honor. Did you argue that a facial challenge is impermissible here other than because there's nothing wrong with the statute? Did you argue that—I mean, obviously, you didn't cite Moody in your briefs because it hadn't happened yet, but did you argue that only an applied challenge could work here, that a facial challenge is a non-starter? We may not have argued it in those terms, but I think Moody itself is illustrative on this point. The parties in Moody were very focused on one application of the statutes in the court in Moody, and I believe, you know, Justice Alito says this quite clearly in his concurrence. The court in Moody nonetheless said that it is the court's duty to apply the proper standard, regardless of perhaps how the parties have framed their arguments. And since this is a facial case and has always been, we think that at the very least, a reevaluation of this in light of Moody's discussion of how to do a facial challenge is appropriate. At what level—there's kind of layers to this statute. We've got the DPIA. We've got the—I think we've talked a little bit about the subsections of 1A, the Romanets, the content, conduct, other personal information. At what level should we be evaluating the facial challenge for purposes of what's at stake that would then lead us into a severability analysis of what's left? So I think at the very least, the court needs to look at each specific individual subsection of regulation and whether or not that—how that specific subsection operates. We think that's one of the fundamental flaws of the lower court's decision. So, for instance, the DPA requirement as distinct from the subsections that involve, you know, no collecting geolocation data or requirement to have a mechanism to address privacy concerns. So at the very least, each of those subsections should have been addressed individually as to whether it even regulates speech to begin with and then what is the proper First Amendment challenge for that specific subsection. The sub-subsections of the DPIA. So I think the—my take on it is it seems like the parties as well as the district court have dealt with Section 31.1.B and all of those eight sub-subsections as a batch. Is there anything in the briefing or the record that would allow us to distinguish, for example, between the eight—sub-Roman at eight discussion of personal information or discussion of advertising versus the calling out of content in Roman at one? We would think that the court is perfectly capable of doing that. I believe one of our—it may have been in a footnote notes that that is the sort of granularity that the lower court failed to do with severability analysis. Since we have argued that the lower court should have taken a much more nuanced and granular approach to severability and looked at the specific sections that that were unconstitutional vis-a-vis the remainder. What's left of the—so the enforcement provision, and this is the discussion in terms of the severability, the enforcement provision, a condition precedent for enforcement is whether a DPIA is on file. What's left if, assuming for purposes of argument, the DPIA requirement is unconstitutional? What's left given that any remaining enforcement is keyed to the DPIA? So the DPIA only operates as a notice and cure to the extent that it's been completed. So were the court to declare, you know, to enjoin the DPIA requirement, which would—that would enjoin the notice and cure safe harbor, but the remainder of the law would remain enforceable because the rest of the enforcement provisions would still be intact. Companies would just lack that safe harbor notice and cure provision that flows from preparing the DPIA. But counsel, I'm a Californian, my colleagues are not, so I followed this as it went along and it seemed to me that it was very clear that the 90-day safe harbor was a negotiated provision primarily with the industry that had to relent to this. It was a safe harbor. The idea was to get people to voluntarily cooperate. It seemed to me, based on the record, that the 90-day consultation period was indeed a condition precedent to enforcement. What's your best argument that that is not the case? So two responses to that, Your Honor. The first is that I think if you apply the separability test under California law, that the grammatical, operational, and volitional separability, all three of those criteria are met. You can exercise it without making the statute unreadable. The statute can operate just fine without a 90-day notice and cure, though I'm sure— Well, how can it—well, let me put it this way. Arguendo. If the 90-day provision is a condition precedent that is essential to enforce, which my colleague has been talking about, how can it then be separable? So, Your Honor, my second response to that is that, you know, this Court has broad equitable discretion when it comes to fashioning an injunction. And should this Court feel that the only way to preserve the remainder of the statute, because we think the legislature would have wanted to keep as much as possible, especially when we're talking about limitations on data use and privacy settings, that was really what the legislature worried a lot about, it can certainly fashion an injunction that retains the 90-day notice and cure, but just severs the DPAA requirement. Let me ask you this. If the California legislature—and this is all arguendo, okay? If the California legislature knew that a court of the Ninth Circuit Court of Appeals was going to knock out the DPAA, would they have gone forward with the rest of the legislation without any report, without any condition precedent to enforcement? I think so. And I think that that flows from both the factual findings that we see in the statute itself and from the legislative record, which shows a lot of concern about children's privacy and harm stemming from data use. And while the DPAA is part of how the hope was to remedy those, the remaining substantive provisions of the Act are also important in helping with that. I see I'm running low on time. Just one—coming back to something you said, Ms. Liska, about how the notice and cure could be saved. How is that even grammatically possible, looking at C-1, where the thing that is noticed is if they have complied with the DPAA? I just want to be clear that I understand how you see this working in a world without the DPAA. I think that the way that you could do it is if you look at the language of C-1, which starts with if a business is in substantial compliance, you could just excise that prefatory clause and start with the attorney general shall provide written notice to the business before initiating an action under this title. Thank you. I have one. Okay, go ahead. So including because of the Supreme Court's ruling, this case has a number of moving parts. If we were to hypothetically view the DPAA provision or provisions as unconstitutional, does the attorney general believe there would be any benefit to certifying to the California Supreme Court the severability question? That is certainly an option on the table if this Court has serious concerns about severability. Again, we think the arguments that we have made clear that the DPAA requirement would be severable, but if this Court has deep concerns, that is always an option on the table. Very well. Okay, we'll give you a little extra time because we're changing over.  All right, so is it Korn Revere, is that the correct pronunciation? Please proceed, sir. Good morning, Your Honors, and may it please the Court. AB 2273 is a speech regulation masquerading as a privacy law. The overall thrust of the act is to regulate Internet speech, how it is presented, its content, and who is connected. Counsel, before we get too far along in this, as you well know, you have a lot of time. You have challenged this law facially. How does the Supreme Court's recent decision in Moody impact your challenge here, if at all? I don't think it impacts our challenge at all. As a matter of fact, I think it confirms that facial challenges in the First Amendment context are allowable when a substantial number of the applications of the law are unconstitutional compared to its plainly legitimate sweep, and I think that standard is clearly met there. Let's say, arguendo again, if I were to agree with you about the DPIA portion of the law, but not necessarily with respect to the rest of it, what would that require us to do? Can we basically just attack or deal with that one portion of it and not deal with the other if we felt the district court was incorrect in its facial analysis of the balance of the law? Well, I think as Your Honor's questions indicated during my friend's presentation, that the law would be very hard to understand or apply if the DPIA provision were knocked out. It ties directly to Section 35, which is the enforcement provision, which starts with the predicate in Section 35A that if an entity that is regulated by the Act is in substantial compliance with the law, then you get a 90-day grace period. That presupposes that we know what substantial compliance means, and it requires that substantial compliance in the first place. Counsel, let me address one particular part of the statute, although this is not the limit of my concerns. So, I don't know if describing it as subsection is correct, but you'll know what I mean. Section or subsection 32, establishing a working group. The district court enjoined it, which to me is essentially a prior restraint on speech. The district court enjoined the speech that is called for in the statute that is individuals making a report to the governor. So, how is it that that, for example, setting up a working group wouldn't be severable even if the DPI provisions were declared unconstitutional, even if, as the district court said, well, the working group might be opining on things we've already said are unconstitutional. But why wouldn't, for example, that be severable? I think the working group would be severable except in a facial challenge, as the Supreme Court said in Los Angeles, that you look at, in analyzing the overbreadth of the statute, the regulatory parts of the statute. We don't view the working group as regulatory. It's an advisory panel. But the judge enjoined it. The district judge enjoined the working group. Yes, but I don't think that that as a — the fact that there's an advisory group provides a plainly legitimate sweep that would save the overall statute. If you look at the working parts, the regulatory parts — But wouldn't it save the working group part? Well, not to the extent that the working group is providing advice on how the law is to be implemented and applied. So, a prior restraint by the federal court barring individuals appointed by the legislature from opining on putting a statute into effect that one or four judges have declared is problematic, that that's not legitimate or severable or couldn't be enforced? It could be enforced, but it's not enough to save the statute. I think if you look at the parts that regulate speech, you can look at the law in essentially four buckets, the first of which you extensively discussed during my friend's time. Those are the DPIA requirements. I think they are plainly a content-based regulation. They are a prior restraint, as we explained in our papers. We agree with the district court, except to the point that the court decided that this was — Following up on my colleague's question, though, and again, it's hypothetical. If our court, our U.N. know where to find the DPIA, is unconstitutional and is not severable, do you even care whether we get to the balance of the law on the basis that it is, in fact, not facially challengeable? Does it matter to you? Well, it does, because the other provisions are equally unconstitutional as the prior restraint and the DPIA. Look at Section 31A.5, the age assurance requirement. That requires every website, whether or not they previously had any mechanism for judging the age of its users, to do something in that regard or limit the way it can deliver speech. Mr. Kornrever, before you get too much further, I'm eager to hear about the other three buckets, which might help us to structure our future questions. And that is the second bucket. The first one is the DPIA requirements. The second one is age assurance. The third is the policy enforcement provision of Section 31A.9, which essentially deputizes private parties and gives the state oversight ability to determine whether or not they are properly applying their content-based standards and, as the evidence in the district court revealed, very subjective standards, editorial standards. And then the final are the data use provisions in Section 31B.1-7. Those are the ones that restrict how data can be used. And, as we noted in our papers, those also restrict speech, as the Supreme Court held in Sorrell v. I and myself. I want to get back to, again, following on what we've all been talking about here. Why, arguendo, would it be a problem for you if the Court were to say the DPIA is unconstitutional, it's not severable, and then because of that, the rest of the Act is not either, because you can't enforce it? Well, how about that? What's your position on that? Well, we take the win, but I think there are so many things about this law that are unconstitutional that it's important for the Court. But if we, again, arguendo, if we conclude, particularly in light of Moody, that the balance of the law is not wholly, facially challengeable, it would have to be done on an as-applied basis and considered section by section, that you would have to send back to the District Court again. Do you agree? No, Your Honor. And because, first of all, because of the rule established in Patel, that you look at the regulatory portions of the law. But beyond that, the question, and it's repeated from the over-breath analysis in United States v. Hansen, that you look at the extent to which the law has unconstitutional applications, and then you determine whether or not that is too extensive in relationship to the law's plainly legitimate sweep. And so you're looking at how much speech is suppressed by the unconstitutional portions compared to other provisions and whether or not that is sufficient to save the law. But, Mr. Kornrever, I guess this is a very helpful discussion, trying to distinguish between severability on the one hand, the facial on the other, and the section by section analysis. I guess I read Moody, and correct me where I'm wrong here, to be distinguishing between, and I think I would read Hansen the same way, to be distinguishing between a facial challenge to a single provision. I think in Hansen, they're looking at the applications, and there's some contextual work, but they're not actually scrutinizing the other pieces that inform the reading of the statute. In Moody, they're also slicing and dicing for purpose of the facial challenge. In other words, why isn't the facial challenge to this subsection, and that has to be dealt with? And then there's a separate facial challenge to, is this subsection unconstitutional without a plainly legitimate speech? Why wouldn't we do it or require the district court to do it section by section in that way, and then we're left with a severability analysis? Well, there are a couple of responses to that, Your Honor. One is the district court, in essence, did go section by section. The state had requested briefing on the severability question. There was separate briefing on that, and the district court then did go section by section through the act and determine, for purposes of the severability analysis, whether or not those provisions were constitutional or not. Of the ten mandates and eight prohibitions in the law, the court determined that eight of the mandates and five prohibitions violated the First Amendment. So there's no legitimate sweep to asking a company to estimate the age of its consumers for purposes of non-content-based safety regulations? Well, again, all of these regulations are tied to the content-based determination of whether or not this is safe. As you pointed out in looking at the factors that the court or that the state requires companies to assess when they're determining in their DPIAs. Well, I did that with respect to the DPIA. I don't think that the, I guess, how is the age estimation, for example, tied to the factors in the DPIA? Well, again, the factors in the DPIA determine what you are looking for and why you impose the age determination, and the age determination is being made to determine whether or not it is acceptable to communicate with the user and how that communication can take place. That really leaves us, in my judgment, with the same problem the Supreme Court dealt with in Moody, because, as has been pointed out by our questions, there are sections of the non-DPIA portion of the statute that, at least in my judgment, cannot be analyzed on a facial basis. It requires an as-applied analysis. The district court did not do that, right? Well, the district court didn't follow the formula that Moody prescribed because Moody came after it. Which is why the Supreme Court sent it back. But the law hasn't changed, and there's a reason why the court sent it back in Moody, where it would not be appropriate here. Keep in mind, in Moody, the court was looking at an analysis from the circuit courts that involved two services for two different online companies, basically news feed and those kinds of things, whereas it did not look at all of the conceivable applications, such as whether or not Uber was covered. But, counsel, respectfully, I think the district court's decision is a little bit different, and I'm looking at ER 38, page 37 of the court's decision. Given that multiple provisions of the CAA-DCA will be preliminarily enjoined, and the court's determination that these are not functionally severable from the presumably valid remainder of the statute, the court concludes that it cannot sever the likely invalid portions from the statute and sustain the remainder. So, the only basis that I see for at least a significant part of the court's ruling is the severability analysis and not doing the type of analysis that the Supreme Court, I think, has commanded in Moody. I believe that's what my colleague is saying, but I don't want to put words, obviously, in Judge Smith's mouth. You've done an excellent job of it. I would respond in this way, and that is, obviously, Moody came after the district court's opinion, so the district court didn't have the benefit of framing its analysis in those terms. But Moody didn't substantially change what the law is. It basically affirmed the analysis in Hansen that if there are enough unconstitutional provisions of a law that it can be challenged as overbroad and challenged on its face, and you compare those findings to the plainly legitimate sweep, the district court's analysis, because it did go provision by provision in analyzing the severability, gives this court sufficient information on which to fit the analysis into the mold prescribed by Moody, and it is the de novo review. As we're all saying here, though, as you very well know, in a facial challenge, there can be no circumstance in which any application of the statute is constitutional. And as was pointed out with calling with respect to the working group, for example, that probably has no problem at all. So if there are portions of the law that clearly don't fall on a facial analysis, what does that do with what we deal with here? DPIA may be a separate issue, but with respect to the balance of the statute, I don't think the district court applied anything other than a facial analysis, and it seems to be the very kind of thing that the Supreme Court said in Moody was not right. You have to, it didn't fit in the facial analysis category. Well, I would distinguish the facial analysis category in a case like Salerno from a facial analysis in a First Amendment challenge, as in Stevens and in Moody. And in that case, you're looking at not just whether or not any provision can survive, but whether or not the unconstitutional provisions as determined by the court outweigh those provisions that could still exist. So following up on what I think was one of Judge Johnstone's questions, in doing that analysis where one is putting the good on one side and the not good on the other and seeing if the not good substantially outweighs the good, that your view is we don't look at individual distinct provisions of the statute, that because the California legislature has chosen to put 10 or 15 or 20 different provisions that deal with some different things with the same statute or bill number, that we look at all of them together and divide them up as opposed to looking at distinct statutory provisions in the bill simply because the legislature chose to stick them all in one legislative enactment? Well, no, I think you look at the overall thrust of what the bill regulates and then determine whether or not the unconstitutional portions outweigh that which is constitutional. But you don't think in doing that we should analyze what we consider to be separate type provisions separately and look at provision 29 and say we need to do a separate facial challenge analysis of 29 because, yeah, it's got some unconstitutional stuff, but there's plenty of section 29 that could be that there are circumstances where that works and so a facial challenge doesn't work. You're saying we have to do 1 through 29 together, we can't look at 7 separately from 29 in making our numerical sorting? Well, no, I mean you can go either way. You can look at the statute as a whole and determine how much speech it regulates and in this case the answer is a vast amount of speech. But why doesn't that confuse it with a severability analysis? That sounds like a question for severability, not a question for a facial challenge as to each of the law's provisions. Well, I mean I think they are interrelated in that if you're doing a severability analysis, you are making a judgment about each of the law's provisions and determining its constitutionality. At the end of that, if you determine that the overall impact of the law is to regulate a substantial amount of protected speech compared to its plainly legitimate sweep, then at that point you make the judgment on a facial basis that it is unconstitutional. So just to take another example, you don't challenge at least some of the geolocation provisions? That's right. There were four provisions in section 31B we did not challenge. Okay. And so this matters because the First Amendment is federal law, the question is state law. And so I think it's pretty important that we keep those two separate within our jurisdiction. So that's not even challenged. So you're saying that simply by virtue, as Judge Bennett says, of the fact that the legislature has decided to compound these, subject to under state law, its own severability analysis, the unchallenged geolocation of children protections in the bill fail simply because it was enacted alongside the more suspect EPIA? Well, and therein lies the problem because— As a matter of First Amendment law, not severability law. If, right. If having any unchallenged or any constitutional provisions are enough to immunize a law from over breadth challenge, then you've simply made over breadth anachronistic doctrine that it simply can't be applied. I gather what you're saying is that even if the district court failed in, well, in the way it applied a facial challenge to the balance of the law, not the DPIA portion, it's okay to consider it for purposes of severability, but if not for purposes of First Amendment analysis. Is that correct? I'm not sure I understand your question. In other words, the district court—let's go back. If the DPIA is, in quotes, unconstitutional, in order for us to determine, if we did, that it is not severable, can we look at the balance of the act, even if we think the district court could not analyze it facially, can we look at the balance of it and say, under California law, this isn't severable? Can we do that? Yes, absolutely. I mean, you can— Is that what the district court, in effect, did? And the district court did determine that that portion was not severable because it was interrelated with the rest of the way the law operated. Let me just add this, and that is, if the court is inclined to have doubts about whether or not this is subject to a facial over breadth challenge, I would request the opportunity for additional briefings since Moody did come after the district court's decision. I would ask also that if there is any further consideration or even a remand, that the injunction remain in place because what the state has never contested were the factors involved in granting preliminary injunctive relief, and that is irreparable harm and likelihood of success. Those— Your time is up. If you want additional briefing, we will certainly let you know, but thank you very much for your argument. So the state has some rebuttal time, and we're going to let you know if you want that minute, right? Of course. Thank you, Your Honor. I appreciate that. I think I'd like to sort of pick up on sort of where the discussion with my friend on the other side was going, which is that when you look at this law and do a facial challenge, we would contend you need to do a facial analysis of each separate subsection, and that that was really what the lower court failed to do. The question, and Moody sort of makes clear, is not sort of the overall thrust of the law. I mean, if you look at the language in Moody, it says a court needs to look at, quote, what activities by what actors do the laws prohibit or otherwise regulate, and drill down into this full set of applications. So we think that really, in a law this complex, that necessitates looking at each separate provision because—and what the lower court did is it just sort of grouped them together and said speech is involved. But if you look and sort of disentangle these, that's not necessarily the case, and different constitutional tests may apply to different provisions. Compelled speech, for instance. We argue that if you look at the provision about enforcing terms and services, that's not a First Amendment problem under cases like Cohen that relate to private agreements. Parts like age estimation— Let me ask you what I ask your colleague because it's important to me. The district court, in its severability analysis, again a state law question, look at the entirety of the bill. For purposes of analyzing what we do with this injunction, can we, arguendo, if we said the DPIA is unconstitutional, even if we disagree with the way the district court analyzed the balance of the bill for purposes of First Amendment law, can we interpret it in determining whether this DPIA section is severable? Can we analyze it based on the district court's review of the impact of the balance of the legislation? I think that, yes, I want to see that I sort of track the way that you're viewing this. I think the way to view severability is if you were to take like an entire piece of paper and you were to carve out a hole from the middle, which is the part that you view as unconstitutional, can the rest of the piece of paper stand? You do have to look at the remainder of the law with respect to if I pull out that part that is unconstitutional, does the remainder collapse like a house of cards or is it sturdy enough to stand? I guess maybe a Jenga tower is a more apt metaphor. Is it like a Jenga tower where I pulled out a block and the rest of the tower stands very well? That's the three-prong analysis under California law. Is it grammatically separable, operationally separable in that the rest of the law can function without the piece, and is it volitionally separable, which we note in our reply brief asks would the legislature have preferred the remainder of the law to nothing, not would it have preferred everything it could have gotten versus the part taken out, but would it have preferred to keep everything it could keep constitutionally to having nothing in place? We do think you have to look at the specific provision that's unconstitutional, and we think the district court's error was not drilling down at each subdivision to determine that, especially under Moody. I see my time's up. Thank you, your honor. I'm sure we could talk about this for a really, really long time, but we're not going to, but thanks for your learned argument. We appreciate it very much. The case just argued is submitted.
judges: SMITH, BENNETT, JOHNSTONE